We will hear argument first this morning in Case 24-1046, Wolford v. Lopez. Mr. Beck? Mr. Chief Justice, and may it please the Court, Bruin holds the Second Amendment protects the right to publicly carry firearms. By banning people from carrying firearms on private property that is open to the public, unless they first obtain affirmative permission, Hawaii has run roughshod over that constitutional right. The presumptive ban clearly inflates the Second Amendment as plain text because it regulates arms-bearing conduct. As such, the burden is on Hawaii to justify the presumptive ban with relatively similar historical analogs, reflecting a national historical tradition of firearms regulation. Hawaii comes nowhere close to carrying the burden. Its presumptive ban defies a national tradition of allowing people to carry on to private property open to the public unless the owner objects. Hawaii is at a threshold position that this Court should adopt a state-by-state community standard. It lacks support in this Court's precedent. In Hawaii's argument, the laws of the Kingdom of Hawaii determine Petitioner's Second Amendment rights as completely without merit. The presumptive ban is inconsistent with our national historical tradition of firearms regulation. Hawaii attempts to show a national tradition by relying on black codes expressly passed to discriminate against African Americans in anti-poaching laws. These types of laws are nowhere near relevantly similar. Because nothing in our nation's historical tradition begins to support Hawaii's effort to thwart the exercise of a fundamental right, Hawaii's law cannot stand. I welcome this Court's questions. You argue that this law prevents access to about 97 percent of public areas. How do you arrive at that? We're not arguing that this specific law is banning 97 percent, Your Honor. The overall package of laws passed by Act 52 bans, presumptively bans, carry on 96.4 percent. And we arrive at that figure by having an architecture firm go through the public records of the County of Maui to determine which areas were regulated by this package of laws, Your Honor. So that 94, I think it was 94, 97 percent. 96.4, Your Honor. Justice, Justice. That includes all the areas the law bans, correct? Yes, Justice. I understood that much of Hawaii is state parks and state property, correct? A portion of it, yes, Justice. A pretty sizable portion. So that 94 is over-inclusive of private property, correct? It includes parks and beaches, yes, Justice. Now, and there are other areas, sensitive government areas, et cetera, correct? That's correct, Justice. So you say that there is a constitutional right to carry a gun on private property? Yes, Justice. I've never seen that right. I mean, I understand that there is a right to carry a gun on private property with an owner's consent, expressed or implicit, correct? My question is very simple. Is there a constitutional right to enter private property with a gun without an owner's expressed or implicit consent? The answer has to be simply no. You can't enter an owner's property without their consent, correct? Expressed or implicit? Correct, because that would be a trespass, Your Honor. All right. So if we start from there, then I start from the simple proposition. You want to say that there is a custom that permits you to go on private property without the owner's expressed consent, correct? Yes, Your Honor. All right. So Justice Scalia said that every statesman at the founding knew that you could not enter private property without permission. It's a trespass, correct? You're not allowed to come on private property where you don't have permission to go to. All right. So if we're looking at a custom, I thought under McKee, Justice Holmes looked for evidence, quote, that a practice had prevailed in Missouri where the suit originated. Whether you could collect shells in Missouri depended on whether there was a custom in that jurisdiction, correct? The custom of the nation is what McKee holds, Your Honor. It didn't. It looked at the custom of Missouri where the suit originated. McKee specifically talks about the laws of the nation as being what's the spot. McKee, Justice Scalia did in Hardeen's, but in McKee, Justice Holmes wasn't talking about the tradition of the nation. He was looking at whether the tradition of Missouri permitted people to go onto land to collect seashells. I'll have to disagree. The word nation appears in that. All right. Well, I'll look at it more closely. But at the time of the founding or about the time, 71, 1721, 1722, up until the founding, there were at least three states who prohibited hunting, as you called it, or trespassing on private property with a gun, correct? So there was not a uniform national practice. There was, Your Honor, of carrying on private property that's open to the public. Every case that you're, every law that you're citing to deals with prohibitions on enclosed lands. Enclosed lands, there was a, those laws deal with, enclosed lands were closed to the public. Not necessarily. Look at Mount Vernon where George Washington lived. There was a county shop there. By definition, if I- That's a closed land. Enclosed lands, I referenced the amicus brief of the United States. They reference a lot of the article by Sigmund, and it goes into express detail that enclosed lands are, were closed to the public. Counsel, do you agree, picking up on that, that Hawaii could pass a law that prohibited the carry without the express consent of the owner on lands that were closed to the public, on private residences? I do not, Your Honor. Really? Like, so I couldn't, Hawaii can't have that law about, you know, my house or Justice Gorsuch's house? Step one of the plain text would be implicated, because we're talking about carry, and then Hawaii would need to justify that with a national tradition. And even assuming the three laws, I don't think three laws is sufficient to demonstrate a national tradition. But you agree that all of the business owners and maybe also private property owners in Hawaii could get together and say, we don't want this, and they could not give consent. Let's say the law is flipped. It says it's illegal to enter if you have been denied permission to carry a gun on the property. You agree that all property owners could get together and say, we're denying permission, and they could put such, you know, placards up in their window, and then you would still not be able to carry a gun on 97 percent of the property in Hawaii? Yes, Justice. Everyone, every private property owner has the right to affirmably put up a sign, otherwise not give permission for people to enter a property with a firearm. The crux of our argument is that Hawaii has flipped that historical default from them having to affirmably say guns are not allowed here to the current law. But I guess my question is, isn't that historical default that you're referencing really a default that is rooted in property law and not constitutional law, not in the Second Amendment? I mean, the argument that some have put forward is that this is really a property case, not a Second Amendment case. Yes, it is about guns, but the argument goes, what's really going on here is how states treat a private property owner's consent under circumstances in which everyone agrees that consent is required. You just agreed that consent is required, and so fine, there are many states, and perhaps even most states, that say we're going to imply that a property owner who opens his property to the public is giving consent for people to carry a gun. Hawaii has said no. What we're going to do is we're going to say, even if you've opened your property up to the public, you still have to have express consent. We are not going to make our property owners put up signs or be the one that has to affirmatively express. The person who comes on has to have consent, has everybody agreed, and in Hawaii, that consent is expressed. Why isn't that, and all the cases that speak to it in the historical record, really about the property interest and property rights and not about the Second Amendment? Because here, the law at issue implicates arms-bearing conduct, Your Honor. But that doesn't mean it implicates. What I'm suggesting is that it might affect, right? And the United States was here just last term sitting, talking about how you could have rights and regulations that affect someone's interests, but they actually don't implicate their constitutional rights. And so here I'm saying, yes, gun owners are going to be affected because the property owner says, no, I don't want you to bring your gun on unless you come to me and I give you express consent. But that doesn't mean it implicates their Second Amendment rights for the purpose of Bruin. Well, in Bruin, the court said there's a general right to carry. A general right to carry on public property. Justice Barrett just explored with you the fact that you don't have a general right to carry on private property. It's a right to carry in public, Your Honor, not a right to carry on public property. But you do agree that there is no right to carry on private property without the owner's consent, right? Here the Second Amendment is implicated, especially anywhere you carry in public. And here this lawsuit deals with private property that is open to the public. I understand. But what I'm suggesting is that let's suppose this lawsuit dealt with someone's house and it's not open to the public. Do you concede that there is no Second Amendment right to carry a gun into someone else's house? I do not, Your Honor. You do not? I do not. You would still be dealing with carry. If someone gives me an invitation, a general invitation to enter into their home, and there's a historical presumption that you're allowed to carry a firearm with you, then if the government passes a law that says that flips that historical presumption. Right. But I'm just suggesting that the historical presumption is about the consent, not about your rights. We agreed at the beginning. I thought there was a general consensus that your right to carry is limited to the permission of the owner when you're talking about private property. Like you've already agreed that the Second Amendment right is, I would say, subordinate. But, you know, in the panoply of rights, the right to exclude is superior because the owner can say, no, you can't bring this gun in here. And so once you've done that, these laws that are about licensing or, you know, implying that the owner has consented are all in the realm of property law, I think, and not in the realm of the Second Amendment anymore. I don't see it that way. You disagree? All right. Yes, Your Honor. Thank you. Counsel, do you agree that the state as property owner could exclude someone, not this implied consent law, but let's say that the state as property owner put aside the fact that the sensitive places here include state-owned property? Assume that that's not so. Could the state as a property owner say that you can't carry a gun onto state-owned property as a matter of consent under property law? No, Your Honor. I think that's a different analysis because now we're dealing with direct state action. And the state doesn't have the right as a property owner to limit who carries a gun, say, into the governor's mansion? I think that there are certain locations that where the governor... So it's all a matter of sensitive places? Yes, Your Honor. Counsel, you make an argument that Hawaii effectively destroys the right to bear arms. You discussed that a little bit with Justice Thomas and with Justice Sotomayor. And I'm wondering where you think that analysis fits into the two-step Bruin framework the court announced. In this case, step one merely deals with the fact that the state of Hawaii, that the carry is implicated here. And once we go past, once we accept that carry is bearing arms and issues here, everything else is dealt with under step two, the historical analysis portion of this analysis, Your Honor. So it really doesn't matter? Whether it was actually 96%, which we know it's not, because you're dealing with the law as a whole. There's no means and scrutiny permitted by Bruin, correct? Interest balancing has been abrogated by... By Bruin. So there's no interest there. So if, in fact, if Hawaii has a right to regulate a custom as opposed to a constitutional right to bear an arm on private property, then tough luck, correct? We have established in our briefing, Your Honor... Counsel, there's no means ends. So if they over-regulate or under-regulate, that's irrelevant. Is there a right to carry a gun? As we know from Rahimi, there's a general principle that dictates that you have a general right to carry. When the government violates that right, then because it violates that principle, then the... That's the interesting part. There certainly was a principle of the states regulating hunting on private enclosed property. There was a history of, in at least New York, in 1763, just before the founding, that prohibited trespassing and hunting on other people's lands because trampling on the land was destroying it. So you don't need, under Rahimi, an exact duplicate historically. You just need an analogous principle. If the states could regulate there, why can't they regulate here? Well, very simply, those laws deal with... are not anywhere close to the law at issue here. The state has pointed to a number of anti-poaching laws on property that was not open to the public, whereas here, they're regulating a specific type of carry for self-defense on private property open to the public. I mean, these laws are just simply not... But what's open to the public in the license that you have to use that land is subject to custom. It's subject to a national tradition that we had at the time of the founding, Your Honor. It's not a specific custom that exists right now. The means and ends is not a part of our equation. I don't understand what pertinence that has. Because in order to do the Bruin analysis, we look to see whether a law is implicated by the Second Amendment right. Then we look to see what the historical tradition was in this country. But that seems... If you could regulate to not trespass, trample the ground, if you could regulate not to hunt, if it's not means and ends, why can't you regulate simply to switch a presumption that gives the owner the right it has to give you express consent to say yea or nay to carry the gun? Well, for two reasons. Because that violates our nation's historical tradition of firearms carry. And two, it violates a principle... But we didn't have... I see that your red light is on. Yes, Your Honor. We've been talking about private property and public property. A gas station on the side of the highway is private property. It's owned by the gas company or whatever. Do you assume that you have the right to go on that private property even without any express permission? Yes, Your Honor. Even though it's private property? Yes, absolutely, Your Honor. Is it a different analysis or the same analysis when you're talking about a dwelling along the side of a road? That's a different analysis, Your Honor. You have to see whether there's some sort of invitation to come in there. Is there, under our law, an invitation, for example, for people solicitating, for people who want to drop off pamphlets about a particular... Yes, Your Honor. Up to the doorknob or, you know, there is. Even though it's private property? Yes, Your Honor. A stranger can walk off the sidewalk and go up to the door? Yes, up to the door, Your Honor. Thank you. Justice Thomas? Justice Alito? Under Hawaii law, are there any other objects besides guns that a person may not possess when that person enters private property that is open to the public? Not to my knowledge, Your Honor. Thank you. Justice Sotomayor? In Hawaii, for 200 years, there's been no custom of carrying weapons, correct? Up until Bruin and Heller. Up until Bruin, you could not get a license to carry a firearm, Your Honor. So, 78% of Hawaii residents and 64% of Hawaii gun owners do not think that loaded, concealed weapons should be allowed into businesses at all, correct? I'm unaware of that, Justice Sotomayor. I wasn't aware of your 96% number either. Nothing about Hawaii's customs, tradition, or culture creates an expectation that the general public carries guns wherever they go, correct? Hawaii is part of the United States, and as part of the United States, our national tradition is that people are allowed to carry on private property that's open to the public. This law is not banning you from doing that. It's just requiring you to get the owner's permission, correct? And here, the law has always been that you have an implied right to enter onto property. Not in Hawaii. Hawaii is part of the United States, Your Honor. But if it's a local custom that controls. It's not a local custom that controls. Where else in the law have we permitted local custom to create a constitutionally protected right? Broome is very clear here that we're dealing with our national tradition, Your Honor. It's not local custom that controls in this area of law. Justice Kagan? Mr. Beck, the various statutes that Hawaii has cited as going to the Broome Step 2 question, you say they're not close enough. And I guess I want to know why. I mean, I was struck by the fact that there are quite a number of statutes that do exactly what this law does. They flip a default rule as to how explicit consent has to be. You know, they recognize that you don't have a right to go in without consent. You do have a right to go in with consent. And then the question is, how do we determine consent? And what default rule do we start with? And I guess what struck me about these statutes and about how close they are, is that that's exactly what each of these statutes did. So why isn't that pretty good evidence under Broome Step 2 that this is something that states historically have done? The state has not cited to a single case that is relatively similar to the one I've issued here. We've got basically two sets of laws. One with anti-poaching laws that dealt with private property that was not open to the public, one. And part of that also is there are exceptions for people to be able to carry firearms onto those lands for purposes of self-defense. So land that's not open to the public where you still have a self-defense right isn't relatively similar to the law at issue here. And the other sets of laws that that's been cited to are black codes. And those can be relatively similar. As Justice Kavanaugh said in Rahimi, you know, we've moved away from that history. And in addition, it dealt with very, you know, discriminating against a very small subsection of society rather than prohibitions on the general right to carry. Let me go back to the first thing. The idea that these are anti-poaching laws. I mean, okay, Hawaii's is not an anti-poaching law. But I suppose I'm sort of stuck on the fact that that doesn't seem to be the relevant similarity. In Rahimi, we said, you know, you can go up a level of generality. You don't have to have a historical twin. There can be differences. In Rahimi, the essential similarity that we thought controlled was just that the guns were being used to protect against people who would be violent with their guns. And, you know, that's a pretty general principle. And here, the general principle is sort of similar. We think that there is a danger of various injuries occurring when you go onto private property with a gun. It might have been in the old days poaching. It might be something else now. But because that's so, we are going to use a default rule that says to the property owner, if you want this, okay. But you have to say you want it. You know, it seems to me the same. It's a different injury. It's not poaching anymore. But it seems to me the same state mechanism, the same kind of state regulation. Yes, Your Honor. But one dealt with private property that was not open to the public, whereas this law is dealing with private property that is open to the public. And in addition to that, the anti-poaching laws also gave you a right to be able to carry firearms for self-defense. So I simply don't see how the liberal generality there would simply swallow the role if this Court were to accept those anti-poaching laws as being relatively similar here, Your Honor. Thank you. Justice Gorsuch. Your friends on the other side of the Ninth Circuit relied on two statutes in particular. One was the 1771 New Jersey law that you were just discussing with Justice Kagan. But the other one that was left unmentioned was an 1865 Louisiana statute that was adopted immediately after the Civil War as part of an effort, it appears, to disarm black people. Reconstruction governor later explained that this law, of course, was aimed at the freedmen. Do you think the black codes, as they're called, should inform this Court's decision-making when trying to discern what is this nation's traditions? I do not, Your Honor. Well, your friend on the other side says it should, and that the 1865 statute is a, quote, dead ringer for this statute. The 1865 law was expressly passed to discriminate against African Americans who were newly freed slaves. And I just don't see how a law like that can be used to be analogized to a modern-day law, this modern-day law, Your Honor. Justice Campbell, Justice Barrett. Do you agree with everything in the government's brief? No, I do not, Your Honor. The United States government. Yes, Your Honor. The government that's on your case. Yes, I understand. I'm not asking you to throw your case away. I fully endorse the United States brief, Your Honor. Okay, and then I just have one clarifying question. When Justice Kagan was pressing you on the analogies between the anti-poaching laws and Hawaii's law, one of the things that you used to distinguish it was that the anti-poaching laws applied to private property, and these applied to property that's open to the public, albeit private. But I thought you had initially told me that Hawaii couldn't do this with respect to property that was like a dwelling, a private residence, either, that was not open to the public. Well, what I'm saying is that that's a different historical analysis, and if they were to muster enough historical analysis to justify the law, that might be true. I just don't think that they've developed enough history on this record to be able to justify that law, Your Honor. Justice Jackson. The Chief Justice asked you about a gas station on the side of the highway, which is private property, open to the public, and you said that we presume that a person can go in under those circumstances. Is that right? That's correct, Your Honor. All right. I guess what I'm positing is that the reason we presume that a person can go in is not because they have a constitutional right to go in under the Second Amendment or anything else. The reason we presume they can go in is because property law implies that a gas station owner who has private gas station and opens it to the public has consented for people to come in. So it really is a function of property law and the extent to which the consent is being implied or, you know, expressed, and the state law governing that. Right? I mean, you don't have a right to go into private property. You're only there because the owner has either implicitly or expressly consented. You have a constitutional right to carry your firearm onto that specific gas station. You do. Where is that? I thought the reason why this was all here is because you had an implied license. I thought the historical tradition required you to have a license because you don't have a right to go into private property, and the tradition was we're going to imply that you have a license under these circumstances. The basis of this lawsuit is that we're only discussing private property where you have a right to enter onto and is open to the public, and we're saying that once that property is open to the public, we have a right to carry a firearm onto it. Okay. That's the government. Okay. I think I understand. Let me just ask you about the black codes. Justice Gorsuch raised it, and I guess what I'm wondering, your answer to him was they can't be and shouldn't be used, and I guess I'm wondering whether that doesn't signal a problem with the Bruin test, that to the extent that we have a test that relates to historical regulation, but all of the history of regulation is not taken into account, I think there might be something wrong with the test. So can you speak to that? There's nothing wrong with the Bruin test, Your Honor. They're just on a fundamental level. The black codes can't be used because they doubt to discriminate against a small... No, I understand why you're saying they can't be used, but it's because we've moved away from that history, not because that history didn't exist. And so to the extent that the test today is tying us to historical circumstances, it would seem to me that all of history should be on the table. And if we start taking pieces off, whether it's because we've moved away from it or we don't agree with it anymore, I think there's going to be a problem with respect to the accuracy of our test. Your Honor, it's not just because we don't agree with it anymore, it's that the 1865 law is not relevantly similar because it dealt with a very small segment of society that was being discriminated against, whereas here, law is a law of general applicability. So the two... Two people other than the people in this small segment that you're talking about, who were a part of society, but I guess you're saying that for the purpose of this test, we're not going to consider what happened to them. No, what I'm saying is that the Black Codes dealt with a very... It wasn't a law of general applicability. It was designed to discriminate against... It was a racist law designed to discriminate against African Americans, whereas here, the law at issue here is a law that applies to everyone. We can't use a racist, discriminatory law to justify a modern-day law that applies to the general public, Your Honor. Thank you. Thank you, Counsel. Thank you, Chief Justice. Ms. Harris? Mr. Chief Justice, and may it please the Court, Bruin held that states can't refuse to license public carry. Hawaii can't gut Bruin by presumptively banning everyone licensed to carry from doing so at retail establishments or other private property open to the public, absent the owner's express consent. That novel law offends our history and tradition. First, pretextual restrictions are by definition unconstitutional in why they regulate. Here, the law's text belies Hawaii's claim to protect property rights. Hawaii subjects just one right, the Second Amendment, and one class of people, the people Hawaii has a license to carry after Bruin, to its presumptive ban. Hawaii lets everyone else, including target shooters and hunters, bring firearms, machetes, and other things absent the owner's objection. Second, pretext aside, Hawaii can show no tradition behind its law. Its best analog is an unconstitutional black coat. That's because from the founding, the tradition has been that opening property to the public authorizes carrying. I welcome the Court's questions. What's your best support for what appears to be your argument that a pretextual regulation is per se unconstitutional? I would start historically with Blackstone and the meaning of the word infringed in the text of the Second Amendment. If you look to Blackstone, which is one of the main sources underpinning what the preexisting Second Amendment right meant, the canonical example of a law that burdened impermissibly the right to bear arms was the English game laws, which under the pretext of trying to preserve game were designed to prevent commoners from hunting. And we know that was one of the animating premises of the Second Amendment from people like St. George Tucker, from Justice Story. And again, the very meaning of the word infringed in the Second Amendment shows this is part of the history and tradition underlining life. The analysis that you're suggesting, Ms. Harris, is this part of the Bruin test, or is it something separate from the Bruin test? It is part and parcel of the Bruin test. It goes to why the law is regulating the way it does in Bruin's words. In the word of Rahimi, it goes to whether there's a permissible reason. It helps you tell whether the analog is really analog. You're on step two of the Bruin test. You think about pretext. Is that what you're saying? I think that's fair, because step one is, are you regulating arms-bearing conduct? And so one of the parts of whether you tell is this part of the history and tradition, and are the potential analogs really analogs, is to say, why is this modern law regulating the way it is? And if it's pretextual, by definition, you're not going to have analogs, because there is not a history and tradition of pretextual laws that negate the right. Mostly in our constitutional law. I mean, there are exceptions here and there, but mostly in our constitutional law, we've steered clear from trying to evaluate motive, purpose directly. You know, we create rules that maybe are meant to ferret out bad motive, but we kind of think it's a bad road to go down if we're going to ask about every state, whether the state is acting textually in doing one thing or another. And I'm just wondering why we would have a different thought with respect to this right. Because respectfully, that's not our position. We're not saying, think about what's on people's minds. If you have bad motives, it's bad law. What we're saying is, look at the text and see if there is a fundamental mismatch. If the law is gerrymandered textually, which is the case here, in such a way that belies the assertive motive. That is familiar. That seems fair. But then it seems as though that's classic means-end scrutiny. You know, look at over-inclusion, look at under-inclusion. Is the state really regulating what its interests would suggest ought to be regulated? So that's means-end scrutiny, which I thought Bruhn was supposed to get us away from. So two points on this. Respectfully, no, we don't think so. We think, just as Churchill the Lukumi in the First Amendment context, is a case about pretext and not sort of means-end. It's about how do you tell from the text of the law? Is it gerrymandered in an impermissible way? That's what we're asking for here. And the Second Amendment of all places, in terms of history and tradition, is where this test would apply. Because, again, the original meaning of the word infringe in 1791, and I would point you to the Daniel Slate article on this, infringe, what included the Blackstonian concept that if you are regulating for a pretextual purpose that is belied by the design of the law, that is a classic means of infringement. Why are we making it complicated? The text of the Second Amendment covers arms. Part 3 of Heller says it means what it says, says what it means. Part 3 of Heller says there are certain exceptions to that or contours on that which are rooted, but they have to be rooted in history. Here, there's no sufficient history supporting the regulation. End of case. Isn't that kind of the straightforward way, rather than getting into this whole new, elaborate pretext analysis, which, as Justice Kagan says, sounds like what we moved away from? So, absolutely, the case could rise and fall on the lack of history and tradition. I think the one that we're looking for is that there are no sufficient analogs. Usually, as Heller says in Part 3, when you're looking for a historical tradition that justifies an exception to the textually expressed right, it's got to be a deeply rooted tradition, broadly consistent over time, and broad among a lot of states. You don't have anything like that here. So it's just kind of, from your perspective, pretty simple. From our perspective, it's an over-determined case. I think the reason you might want to go on. Why didn't you lead with that? I don't understand why you led with the other argument, and maybe neither here nor there at the end of the day, but I was trying to figure out why. I think two reasons. One is because it would be a shame, I think, if the Bruin Inquiry discounts the idea that it just doesn't account for pretextual laws, given how antithetical they are to the history. What do you mean by pretext? Because a government often will look at one of our precedents and say, well, we don't agree with that precedent, but we want to regulate right up to the line of that precedent. There might be some gray area there. We don't call that pretext every time when a state government does that in the First Amendment. No, and I understand. I don't want to fight this too hard because I think we are in agreement that this is an easy case at the end of the day, and every single way you look at it, there's no history and tradition. Ms. Ferris, on that, moving to that, there's been some suggestion that this is just redefining property rights and has nothing to do with the Second Amendment. And, of course, we don't allow governments to redefine property rights in other contexts that would infringe other constitutional rights. I'm thinking here of the takings clause in Tyler v. Hennepin County. But I'd like you to respond to that argument. That is exactly correct. In no other context could you say that there's an exemption to constitutional restrictions just because you're trying to redefine the laws of trespass. In the First Amendment, it's another example beyond the takings clause. I think Lamont, for instance, is on all fours. He could have very easily said in that case, no big deal. Federal statute is just flipping the presumption. Normally, the default rule is recipients of mail get the mail unless they say no. Just flipping the presumption. Now you don't get your mail if it's on a certain topic unless you affirmatively consent and send in a very easy-to-send postcard. The court absolutely rejected that reasoning. Governor Harris, can we just be a little bit more specific about the Second Amendment right that you say is being infringed here? The point that I guess I'm still stuck on is whether or not in a world in which we all concede, and I think the United States is on board with this, that the Second Amendment yields to the property interests of a private property owner such that the private property owner gets to consent as to whether or not you can carry a gun on his property. When we're in that world, what Second Amendment right is being infringed when the property owner says no or when the state says the property owner's consent has to be expressed? Let me unpack that both in terms of the methodology and the ultimate answer. I think when you collapse the whole inquiry into a specific question of what happens vis-a-vis property rights, you're backing away from the Bruin Framework. The two steps are one— Well, I am backing away because the Bruin Framework only applies where the Second Amendment is implicated, and what I'm suggesting is that the Second Amendment right is not being implicated when the regulation is about the property owner's consent, the form of it. Can it be implicit, or must it be expressed, in a world in which we've said that consent already takes precedent over the Second Amendment right? So what we're answering here is what is the scope of the right to publicly carry under the Second Amendment, and I don't think states can get out of constitutional scrutiny by trivializing what they're doing. But haven't you already agreed that the Second Amendment right yields to the property owner's consent? Of course, we're not saying that you override what property owners are saying, but what we're saying is when a restriction parts ways, when it redefines the concept of trespass, to essentially say for this one category of people, people licensed to carry, you are no longer presumptively allowed to carry at gas stations. But you're only presumptively allowed because the presumption goes to the consent, not to your right. You're presumptively allowed because we're presuming that in this situation, the owner is consenting. And this goes back to the colloquy of Justice Gorsuch, which is when states are trying to redefine property concepts, that doesn't take them out of constitutional scrutiny. Quite the contrary, in both the First Amendment context and the Takings Clause context, the rule is when the states are departing from the default in a way that implicates other constitutional rights, they can't do that. The Takings Clause may be an outer limit in sort of what exactly states can do. But just the floodgates would open if the position were all that's going on here is just tweaking how you consent. Just think about, I think, in the First Amendment context, you would say, no big deal. You are now going from a world where candidates can go door to door for campaign speech, but now you have to have a big sign in your yard that says, political speech welcome for someone to go in. Or in the Second Amendment context, Hawaii's same reasoning would be to rule that it's fine to ban tenants from owning guns in self-defense unless the landlord in the contract expressly consents to doing so. But I really think the concept that this is just tweaking consent allides the burden that Hawaii is imposing here of presumptively banning open carry, banning public carry. Thank you. Justice Alito? Would you explain why the anti-poaching laws that Justice Kagan was talking about are not, in your view, an appropriate analog? Absolutely. Those poaching laws, as the Sigmund article and other sources and the text of the laws themselves exemplify, show the opposite of the tradition Hawaii is trying to show. They show that for property closed to the public, the people have taken steps to enclose for improvements to protect the fields from being trampled by hunters. For that special category, there were laws that said you have to get affirmative consent, sort of like Justice Barrett's questions about do you need affirmative consent to go into the wellings. The rule for other property, property open to the public, open fields, was the exact opposite. There's a conscious decision at the founding, because hunting was an incredibly important issue, that if you did not enclose your lands, it was an open invitation to carry, and that's consistent with the tradition at the founding of public carry that the NRA amicus, for instance, details. The idea that Hawaii's law is a relevant analog would just take the level of generality to justify the opposite of the tradition. It would have been profoundly disturbing to the founding generation to hear that in order to travel at inns or taverns or anywhere else, people commonly carried arms, that they had to get the affirmative consent of each sort of tavern and hope that they weren't trespassing if they were traveling and their carriage had to stop somewhere. In order to determine whether an analog is adequate for Bruin purposes, is it possible to disregard that? How do you choose the level of generality? What is the principle that tells you what is the relevant level of generality? I think here the relevant level of generality does revert to the property law concepts. If you're talking about property open to the public, the relevant comparator is property open to the public, because there is a relevant common law tradition of certain permissions that go there, and when the state is essentially presumptively banning or switching the tradition, I think that is an issue. So I think that's relevant. To disregard the clear text of these statutes, which are focused both on property, that distinction between property closed to the public and open to the public, and the specific question of hunting would allow you to abstract out everything. It's the same thing the court rejected in Bruin, that just because some places, for instance, might be sensitive places, every place could be a sensitive place on the same reasoning at too high of a level of generality. What do you think is the purpose of the Second Amendment right? The purpose of the Second Amendment right is to allow citizens to bear arms for self-defense and other lawful purposes. And other lawful purposes. Yes. Not just self-defense. Did Heller say that? I don't think Heller excludes it, and I don't think the court has to decide is it self-defense and other things, but it would be, again, sort of strange to think that you can't use arms for any other purposes when the founding generation considered arms important not just for self-defense, but, for instance, for making sure that people were proficient in arms to be able to defend the country. So I don't think that there is sort of necessity, but I don't think the case for them. Do you think it's possible to ignore the purpose of the Second Amendment in determining a level of generality that's appropriate? I think that it depends on a case. For this particular case, I don't think the court has to resolve it because the point here is Hawaii is saying its law is supposed to protect private property rights and it's essentially trying to negate people's right to publicly carry weapons. Justice Sotomayor? There's been a number of church shootings recently. Does the state or the federal government, is it far from saying you can't go into a church with a gun without the owner's permission, the church's permission? Is that illegal? The answer to that question would go into the sensitive places inquiry, which is different from this case because that is sort of place-specific. So the question would be, is there a history and tradition of allowing restrictions on people carrying in churches? I suspect there isn't. So I suspect, I could be wrong, I've never read about that, but if we're not looking at property rights and a government's right to regulate a presumption, then what would give the government the right to think that flipping the presumption in that case is reasonable? Just as here, where most property owners for 200 years didn't carry weapons in this state without an owner's consent, that's the presumption of the Hawaiian people. So two points on that. One with respect to the presumption of the Hawaiian people. As the petitioner notes, there is no second amendment for every single state in the union that's different. It is a national tradition, and states cannot retain their pre-statehood traditions as sort of a veto for the second amendment national traditions. It's not a veto. No one's vetoing an owner's right explicitly or expressly to consent to carrying guns. The owner's the one with the right. So to be clear, what I mean by that is you can't use local customs to say that each state gets its own second amendment. The court has rejected that very type of analysis in the Takings Clause, for instance, in Hennepin County, in Cedar Point, where the court said even if California has a kind of unusual way of defining easements or Minnesota has a strange way of defining property interests, that doesn't mean that that sort of... There's nothing unusual about this. This is simply a presumption. Respectfully, this is highly unusual. As the heirs' article itself acknowledges, in all 50 states in the District of Columbia up until Bruin, the universal rule, and this does trace to the founding, is that when you have property open to the public, you are inviting people to go on with arms unless the owner says otherwise. We think that implicates the Constitution, the second amendment, for the same reasons it implicates other amendments and other content. The presumption doesn't change that. The presumption lets the owner choose. The presumption is that you're trespassing. It treats just for one class of people. It turns essentially property open to the public like a gas station. It's the equivalent of someone's house where you're committing a crime under Hawaii law if you actually go on to it without consent. This is Katie. Can you imagine, Ms. Harris, any modern analogs of these anti-poaching laws? I mean, I guess what I'm asking you to do is to say, are there any modern laws that sort of use this kind of authority over, you know, consent and licensing and so forth, but that don't have to do with hunting, that would be permissible because they're very much like these anti-poaching laws? So, two answers. One is, obviously, these laws themselves have endured throughout, which is why I think maintaining the distinction is important. But two, you could say it's not that distant, but there is a separate tradition with respect to property closed to the public, like your house. What are the relevant permissions with the default for property closed to the public setting aside hunting? And I think that's consistent with the way these laws work. I mean, Justice Sotomayor mentioned the 1763 in New York law, and that's talking about enclosed property like orchards or gardens or other stuff and saying if you carry arms on that land, that's a trespass. But it's also saying you can't trespass generally in these places. So I think it's getting to the idea of if you have particular property that's closed to the public, you might not want people with arms on it. That is what these sort of founding era laws say. You don't want them trampling your cornfield and destroying your improvements because it's closed to the public. Similarly to you might be able to say, you know, if I, and again, this is a matter of like what the history would actually show. Your objection to the use of these old laws really is just that the Hawaii law applies to all, although it's private property, it applies to property that is entirely open to the public for, you know, for all other purposes and with respect to all other activities. And that's your view of why Hawaii is different. And if the Hawaii law was narrower than that or if some other states were, then you would have a different question. I think it would present different questions. And yes, that is our main objection. And the reason is Hawaii is trying to use laws that actually show the opposite tradition, which is laws closed to the public. You might need affirmative consent in order to be able to hunt on them. Property open to the public, though, is the exact opposite rule from the founding on otherwise in order to ensure that people could publicly carry absent objection. And so, yes, I think that that is the most critical point about these laws. The fact that they concern hunting, I think, is a relevant additional factor that goes into what was the point of the presumptions. But the fact that it's hunting and also sort of other forms of trespass, I think, is the bottom line. Thank you. Justice Gorsuch? There's been this suggestion that this is just flipping a presumption about the implied license and that that's just a matter of property law and not the Second Amendment. But how do we think about that, given that it flips the presumption on the longstanding implied license only with respect to firearms, not knives, not solicitation, not politicking, not anything else? That's exactly right. I think there's two ways to think about it. One is we do think that that makes it much more like the kind of pretextual laws that founding generations thought were anathema to the Second Amendment because you're singling out a particular right in a particular group who's committing trespass when everyone else isn't. But two, just going back to this concept, you can't just say, you know, you're tweaking how to give consent and you're out of the Constitution. When a state is saying you're presumptively banned, you're committing a crime unless you get consent, that is a much bigger deal than just sort of tweaking the edges of property law. And in no other context has the Court said, no big deal, the Constitution doesn't apply, this doesn't even implicate the relevant constitutional inquiry. What are the implications of why it allows oral consent to be sufficient? California had a law requiring a posted sign. The Ninth Circuit struck that down while allowing Hawaii's law, but I'm not sure I understand the distinction between the two. Why couldn't a state require affirmative signs? Why couldn't it perhaps create an irrebuttable presumption against consent? I think that is exactly where Hawaii's position leads. I don't think there's any principal distinction between those two things. And again, it's not just sort of, oh, is it easy to get one person's consent, how hard is it? That's kind of interest balancing at the outset. But as a practical matter, in order to run your errands, you have to run the table, knowing you're not trespassing on private property to, like, pick up your dry cleaning and catch a cup of coffee. And if you run out of gas and you're trying to find a gas station, you can't get gas unless you know you're in your car, you have your gun in your purse, and you're not actually committing a crime by stepping on the gas station property. Now, Hawaii is trying to say it's a little easier than that, but the text of its law says just entering the property without permission is a crime. And then lastly, there's been some discussion about the Black Codes, and maybe they should be relevant, and maybe we really should consider them as significant here. In fact, they're a dead ringer. Thoughts? It is 2026, and it is somewhat astonishing that Black Codes, which are unconstitutional, are being offered as evidence of what our tradition of constitutionally permissible firearm regulation looks like. So those laws are dead ringers only in the sense that this law, too, is an unconstitutional pretext. The Black Codes were offered, as you mentioned, by states before their readmission to the union. It is not an indictment of the Bruin framework to say that unconstitutional laws do not count in illuminating a valid tradition. As Bruin and Rahimi themselves say, you're looking for laws that illustrate, aren't outliers, they illustrate what the national tradition entails. And so it is no indictment, but frankly an endorsement of our history and tradition, that when you look at the founding era laws, they are very different from the Black Codes, and that these Black Codes themselves are complete departures from what the laws in Louisiana and other states were like before, which was to allow people to presumptively go about in public, on property open to the public, without consent. For purposes of the textual and historical tradition analysis specified by Heller and elaborated upon by Bruin, Heller's Part III on exceptions remains very important, I think, in my view, at least. Do you agree with Part III of Heller, accept Part III of Heller? Yes, we are not trying to depart from anything that this Court has said with respect to its Second Amendment precedents. And then in Part III of Heller, the Court said that nothing, in our opinion, should be taken to cast doubt on laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings. Do you agree with that? We agree with that, and I think as elaborated by Bruin, I think the question is, how do you define relevant sensitive places at the correct level of generality, so that not every place is a sensitive place, and so that you are looking to the right historical analogs? Understood. But you agree with the principle as stated there? We agree with the principle as stated that there are obviously sensitive places. You determine them with respect to the history of firearm regulation. Thank you. Justice Garrett? Mr. Harris, I'd like to talk about the relevant analogs and these anti-poaching laws. And one question that I have is along the same lines as Justice Kagan, which is when you're thinking about these anti-poaching laws, you're thinking about a problem that arose at the time. So at the time, poaching was a problem, and so legislatures enacted this regulation to address the problem. In an agrarian area, an agrarian society, you know, that was it. Let's imagine that Hawaii, rather than just flipping this default categorically, instead is experiencing, say, a rash of gas station robberies. And, you know, doesn't want to make the argument that gas stations are sensitive places. That would be a tough one. So instead flips the presumption, like the anti-poaching laws, just with respect to gas stations. Is that okay? Not okay. And it still runs up in the basic distinction that we're seeing, which is when the history and tradition is for the type of property, property open to the public, to have an implied license to go into the property, when the state is trying to load the dice, when it's trying to say you generally can't go there, it has to point to relevantly similar analogs that are doing the same for the how and why. And the anti-poaching laws, it's not just that they're about hunting. It's about that they're a specific part of land. It's almost like they're the exception to the general rule that on property open to the public, you can generally carry, on property closed to the public. How do you know that's the relevant distinction? I mean, it could just be that, well, that is an incidental of the problem. I mean, that just happens to be where the problem of poaching arose, which was on enclosed lands because those are the people who were trying to protect themselves from poachers. But, I mean, there might have been poaching on open lands, too. And then the legislature might have responded differently. I mean, this is this problem of just because the legislature didn't address the problem because it didn't exist at the time, why does that mean that the analog ties the legislature's hands now? And I think the answer is that you look to the broader articles and I think history of what was going on with the anti-poaching laws. It's not that, you know, poaching or hunting on open lands open to the public wasn't a problem. It was actually at the founding, it was a hugely politically salient and highly debated issue, so important as in state constitutions, that this was a sort of elemental distinction to the founding generation that's carried on our property law, that property open to the public is not, you're not trespassing if you're hunting on that land. And property closed to the public, you want to protect the improvements, and so you are allowed to restrict it by changing the rules so that you have to affirmatively consent. And I think you know that from the laws themselves, actually. I think the laws themselves make that distinction. I point you to the New York 1763 law, the 1771 New Jersey law is of a piece with that, and the Sigmund article sort of canvases the history, but like I think this is not just, well, it's sort of strange they were focused on this particular type of land, what do you draw from it? It is, they were extremely focused on this because it was a huge political topic. Okay, but Ms. Harris, then that raises this question for me. In footnote one of your briefs, you say this case does not concern property closed to the public. So the court need not address state laws that prohibit carrying a firearm into a private residence without the owner's affirmative consent. But both you and Mr. Beck are drawing this distinction in the anti-poaching laws between property that is open to the public and property that is closed to the public. So I guess I don't understand how, if you win this case, and we do the history and tradition analysis, and you win, how is the court supposed to distinguish that analog in the way that you're proposing we do without deciding this question you tell us we shouldn't be deciding? Right, so I think two things are important. One is when you're deciding whether the analogs are on all fours, it's inescapable, and it runs throughout the position that there are different permissions, different common law traditions applicable to property open to the public and property closed to the public. I don't think that is a complete answer, and the reason we're saying it's just not presented is it's not the question presented, to whether property closed to the public, what the range of permissions is, for instance, if I invite someone to my house, what is the tradition with respect to that? So maybe the state could flip the presumption in the way Hawaii is done here, but just with respect to private residences? Mr. Beck said no to that. We're leaving that open because we're thinking of this as, again, different property traditions, and so they would have to show a relevant history and tradition. Again, I think that would be likely easier for them because the rules regarding property closed to the public have always been different than property open to the public. Okay, last question. On your broader argument, you state the rule pretty broadly. Looking at page 11 of your brief, you say, a law is per se unconstitutional if it broadly prevents ordinary Americans from carrying protected firearms in public. Who is an ordinary American, and why? Throughout your brief, you use that formulation, but as I recall, in Heller, it says ordinary law-abiding Americans. Why not the law-abiding, and what is an ordinary American? I don't think we're trying to suggest any difference between ourselves and Heller and our position here. I think we're, frankly, using it as a shorthand. Okay, thanks. Justice Jackson? So I guess I really don't understand your response to Justice Gorsuch on the black codes. I mean, I thought the black codes were being offered here under the Bruin test to determine the constitutionality of this regulation, and it's because we have a test that asks us to look at the history and tradition. The fact that the black codes were at some later point determined themselves to be unconstitutional doesn't seem to me to be relevant to the assessment that Bruin is asking us to make. So can you say more about that?  Black codes were unconstitutional from the moment of their inception because they are pretextual laws that are designed to ensure that newly freed slaves are returned to a condition of sheer property. Okay, let me stop you there. They were not deemed unconstitutional at the time that they were enacted. They were part of the history and tradition of the country, and when we have a test now that's asking us to look at what people were doing back then, I don't understand why they should be excluded. Because they are outliers. They are, by definition, unconstitutional. They have been unconstitutional. Found later, afterwards, not at the time. And if the test says what's happening at the time tells us what's constitutional for this purpose, why aren't they in? Respectfully, a law is always unconstitutional from its inception. So the history doesn't matter. We shouldn't care about the history then. We should deeply care about the history, but the whole point of the Bruin framework is as follows. The history and tradition of the Second Amendment are particularly important because it is codifying a preexisting right. To figure out in sort of common law fashion what the national history and tradition are, you throw out outliers. And I can think of no greater outlier than blatantly unconstitutional laws that flipped what had been the tradition in states like Louisiana. And during the period before those states were readmitted to the Union, for the purpose of trying to reduce newly freed slaves back to conditions of servitude, made it a new crime, new trespass, in order to go about armed on private property. Those are obvious outliers. It should not count under the whole point of Bruin. I think Mr. Katyal will address it. I just have one more question. I'm trying to understand whether there is a Second Amendment problem in the following circumstance. So what if a state that's trying and hoping to dissuade gun rights, so it fits your view of like a state acting in a pretextual way, passes a law providing for free no-gun signs to every business? And they're really very invested in this, so much so that their law offers to send these signs to every business, offers to send someone out to put the signs up at the business owner's request. Do we have a Second Amendment problem in that situation? No, I don't think so. You're not having a law that's regulating arms-bearing conduct. I think the premise, the hypothetical, is you retain this rule. But it affects arms-bearing conduct, perhaps in even a more egregious way than what you're talking about here today. I think we go back to the words of Bruin and Rahim. And their purpose is to dissuade. That was part of the hypothetical. So your test was about the purpose of the state. We have the purpose here. We have the effect here. Ninety-seven percent of the businesses, let's say, in Hawaii, under the test that I'm, or the law that I'm positing, accepts this offer. Yes, and what I'm trying to distinguish is, I think your hypothetical really illustrates what we're not doing, which is a bad legislative motives purpose and sort of effects test. Whereas what we're saying is our pretext argument is very firmly rooted in the idea. Right, I just want to know, is the Second Amendment implicated? And I think you're saying no, and I don't understand why it wouldn't be in this situation if it is in the situation here. Because in the law that Hawaii is enacting, it is regulating arms-bearing conduct by saying, if I carry my gun to a gas station, I am presumptively committing a crime. That is a direct regulation of where and how you can bear arms, under what circumstances. You are hypothesizing a situation in which the state is merely subsidizing certain types of speech. That might have other constitutional problems, but the problem is not going to be with respect to regulating arms-bearing conduct in the way that we think Bruin is talking about. Thank you, Counsel. Mr. Contio. Thank you, Mr. Chief Justice, and may it please the Court. This case is about two fundamental rights, the right to bear arms and the property right to exclude. And there's lots of agreement among the parties about how those rights interact. Everyone agrees there's the right to carry on private property if the owner wants guns on his property. That was elicited by Justice Otemayor to my friends. And everyone also agrees there's also no such right if the owner doesn't want guns. The only question is whether there's a Second Amendment right to assume the owner wants guns on his property when he's been silent. There is not. There is no constitutional right to assume that every invitation to enter private property includes an invitation to bring a gun. The Constitution protects the right to keep and bear arms. It doesn't create implied consent to bring those arms onto another's property. At bottom, that is petitioner's theory, and yet they have zero support for this. Zero support from the founding or for the next 200 years. No treatise, no commentator, no court. Not only is there zero affirmative support, it runs counter to our traditions of implied consent. From the founding in Federalist Paper 45 on, states have used law and custom to clarify the rules around consent. In some states, it's natural to say when a homeowner invites you in, they're fine with you bringing your gun unless they say otherwise. But in others, it's pretty obvious that if you bring your gun to someone's house, you have to ask. And the same is true for stores. In some places, it's reasonable to assume guns are welcome. In others, it's pretty clear an invitation to shop is not an invitation to bring your Glock. It's reasonable for a state to clarify these defaults. Passing laws that say you can assume consent absent permission or is here that you can't assume it. The Constitution permits this type of democratic flexibility in states functioning as laboratories. Before rigidly constitutionalizing one type of property default rule, this Court should insist on at least some evidence that the Second Amendment so requires it. I welcome the Court's questions. Are there any other constitutional rights on which you could place similar limitations? Sure. I think the general proposition of the law is that property rights are— Open to the public. Always add that part. We're not talking about private homes. We're talking about restaurants. We're talking about malls, things like that. First of all, I do think they are talking about private homes. That's what I think ultimately my friend conceded to Justice Barrett earlier in the discussion. I thought he made the distinction between private homes versus property, private property open to the public as opposed to closed to the public. Justice Thomas' brief made that distinction, but at least I understood what he was saying in argument that his rule would apply even there. I think this is what's so dangerous about his rule because he's saying, look, as long as something has to do with guns, then we go right to Bruin Step 2 where the burden is shifted. I'm not going to argue that point, but I do want to know if there are other constitutional rights in similar circumstances on which you could place similar limitations. I do think that there are. I think here this case concerns guns, but sometimes like for example this court's decision in Breard recognized for some First Amendment restrictions you could have a change in the default rule and that was understood as constitutional. Here we're just following the law. Suppose there were a state that said we're going to flip the default rule so that you cannot leaflet in shopping centers unless you secure permission first. Would that be constitutionally problematic or not? The problem there is that oftentimes in the First Amendment context, the First Amendment rules are different than the Second Amendment because they forbid content discrimination and viewpoint discrimination, and the leafletting law often will have some sort of illicit thumb on the scale for a certain set of viewpoints. Like any leafletting for anybody on any subject. Right. In that circumstance, this court's precedents on viewpoint and content are so broad that it might encompass that, but even if you could jump past that, you'd still have to at least have rational basis review. This court in Free Speech Coalition v. Paxton recently said, even for stuff that isn't encompassed in the First Amendment, you still have to have at least some rational basis. Your example would flunk that. Here Hawaii's done the opposite. There have been no guns effectively in Hawaii for 200 years. The underlying expectations and local custom, as Justice Otemayor was saying, was that nobody had to think about guns. What the Hawaii legislature said here in the wake of this court's Bruin decision is, Bruin's a real game changer, and as a result, some shop owners are going to be caught unaware. They're not going to realize that someone might have a concealed glock on them and the like, and so to vindicate those expectations, they said, we are placing the default rule there on the property owner to say whether they wanted to affirmatively invite guns in, and in choosing where to place that responsibility and that burden, I think it's absolutely reasonable for the state to place it with private property owners whose consent is required. Counsel, I just want to understand, because one of the motivating concerns, you can see it in our decisions under the Second Amendment, is that it is a disfavored right, and it strikes me that one of the things that your side of the case has to come to grips with is that it is a very clear constitutional right under the First Amendment. If I, for example, as a candidate for office want to walk up to your door on private property and knock on the door and say, here, give me your vote, that's exercising the First Amendment right. But you say that it's different when it comes to the Second Amendment, that you can walk up, the candidate wants to walk up and he's carrying a gun. What exactly is the basis for the distinction? Because part of, again, what our precedents talk about in this area is that the Second Amendment has been treated as a sort of, you know, a second-level right, and that's one area where, given this law, I don't really see the basis for the distinction. So we totally agree the Second Amendment is no disfavored right. At the same time, there are rules about the Second Amendment, I think rules that this Court laid down in Bruin, in which you've said the relevant question is whether or not the scope of the Second Amendment's text as informed by history would say that there is a violation of the right. With the First Amendment, you've got burden tests and all sorts of stuff that this Court disclaimed in Bruin at page 22. So it's just going to apply somewhat differently. But our fundamental point to you is, yes, this is a law which traces back to the founding with other laws like New Jersey in 1771, laws that basically said, look, when you're bringing guns onto property, even property open to the public, that states are free to flip the default rules. Indeed, that is what happened going back all the way to those early examples. And my friend on the other side is, I think, collectively reading those to say, oh, the Solicitor General is saying, oh, these laws are just about poaching and the like. Absolutely not. They have no answer to what we said in our red brief, which is that these laws dealt with improved lands, and improved lands were, as Professor Hertog says, stores, seed stores and things like that. Let me just switch gears a little bit. We've talked about the tradition in Hawaii. Hawaii, given its obvious origins and its admission to the United States fairly recently, has a totally different, in some areas, tradition and practice. The law of property in particular in Hawaii, for the longest time, maybe it's still the case, is that you don't own property. You get a long-term lease, as if you were a bank in the skyscraper in New York. That was the common method. And I wonder, I thought, you know, as was mentioned earlier, it is part of the United States. And do we isolate, do we have different traditions in different states when it comes to applying Bruin? No, Your Honor. I think my friend on the other side has mischaracterized our argument. Our argument is that the Second Amendment means the exact same thing in every state. No Second Amendment right to enter private property without an owner's consent. What varies is what the definition of consent is from state to state. And local law and custom help inform that. That's what I think Justice Holmes' opinion in McKee recognizes. So just to take a simple example. Well, just before, I don't want to lose the thought. You said part of the history and tradition is there's no right to enter private property without the owner's consent, right? Well, we know that that's not a through line, right? Because you do have a right to enter the owner's private property if you want to exercise First Amendment rights, right? So not without their consent, Your Honor. Well, sure. I don't have to have a sign on the sidewalk before you enter my property saying okay to come on if you're going to give me some leaflet. Or okay to come on if you're a candidate. The assumption is that there is a First Amendment right. Yes, you can withdraw it. And again, I'm just trying to figure out exactly what the difference is between the First Amendment and the Second Amendment. What I think is doing the work in your hypothetical about the leafleting or something is the government is putting its thumb on the scale of some sort of speech and saying they're worried about some type of leaflet or the like. To the extent that they just ban it entirely, it would flunk rational basis review. The relevant right there is not located in the property, in the place it's spoken, but rather the government is coming in and affirmatively taking a position.  Well, Mr. Kyle, I don't understand why you're resisting the First Amendment. Well, I do understand why you're resisting it. But let's say there's no content discrimination. It's just a ban on leafleting and it's a ban because people don't like solicitation. So they just don't want people passing out pamphlets. It's not aimed at Jehovah's Witnesses or anything like that like some of our old cases. Why would that fail rational basis review? So I think it might because as this court said in free speech versus Paxson, you still have to have some underlying rationality for it. They find it annoying. They don't like it. They think it affects their businesses and people don't want to go to businesses if they're going to be accosted by pamphleteers. But it may be a rational basis problem, but I don't think it's a First Amendment problem. This court in Rowan said that, quote, the right to engage in expressive activity generally stops at the outer boundary of every person's domain. And that's the point. One more question. So let me take it out of the First Amendment for you. I mean, let's pretend that public accommodation laws don't exist because the 14th Amendment doesn't apply to private action, only state action. Let's say that a state in the absence of public accommodation laws decides to flip the default and say unless the owner affirmatively consents, black people cannot enter your home. Yeah, so I think that's one which would be unconstitutional every day of the week because it would violate the Equal Protection Clause because the government on its face is making a racial classification. Because there's state action in the way the government is adjusting its property default.  Even if there's a long history and tradition, say, in Louisiana of this kind of discrimination at the doorstep. Right, it would still violate the Equal Protection Clause. Why isn't there state action here when the state is flipping the default? It's not just a matter of property law. Right. Our point is not whether there's state action or not. It's that there's no underlying right. My friend assumes, as he said, there is no right to come onto private property absent consent. And so the only question is whether the state can fill in the conditions. Yeah, there's no right to come onto private property without consent. So my public accommodations example is right. I mean, absent of public accommodations law in a private residence, you could turn someone away on the basis of race. But there is no anti-discrimination component in the Second Amendment the way there is with the Equal Protection Clause. And so that's why it won't change. You're just relegating the Second Amendment to second-class status. I don't see how you can get away from that. If someone owns a store, or let's say it's a little restaurant, and this person has very strong political opinions and does not want anybody in that restaurant who is wearing attire that is expressing approval of a particular political candidate, the owner of that restaurant has the right to say you can't come in, right? Yes. All right. Now, could Hawaii enact a statute that says that if you are wearing the attire expressing approval of a particular political candidate, you can't come in unless you get express consent from the owner of the restaurant? Again, that's a viewpoint discrimination and prohibition. It's a violation of the First Amendment. We have a violation of the First Amendment. And a violation of the right that the court held is protected by the Second Amendment in Bruin, which is the right of law-abiding citizens to carry a firearm for purposes outside of the home for purposes of self-defense. I quite agree with much of what you're saying. I think what's the difference is that the Second Amendment, it's not a second-class right. It just doesn't have the same components of viewpoint discrimination or anti-discrimination for the 14th Amendment. It's just not in the Second Amendment. And I think the key point here is the court, if you accept my friend's invitation, you for the first time would be saying there is some sort of right here which no commentator has recognized, no treatise has recognized, no court has ever recognized. Compare this to Bruin in which you had St. George Tucker. You had many state decisions in the 18th and 19th centuries that said laws like the New York one were unconstitutional. Justice Sotomayor cited a poll about what the people of Hawaii think about the possession of guns. I'm not aware of the poll, but let's assume it's correct. Let's assume that 78 percent or whatever the figure was in the poll that she cited really don't like guns. So what then is the big deal about this statute? Why does it matter if store owners and owners of private property that are generally open to the public don't like guns? Why is it a big deal to say they want people carrying guns to stay out? Just put up a sign. Why does Hawaii have to have this law? So I think Hawaii has, like all state legislatures, has the right to put a default rule in that says that tracks the expectations of its people. That's true. Then what's wrong with California's law, which put the default rule and said it can only be overcome with a sign? Right. So I do think California's law would probably be constitutional, but our argument doesn't depend on it. So you disagree with the Ninth Circuit's decision on that? I do, but I think that you're... So a result here, you'd admit, would logically entail permitting California's law or ones like it to pass. No, you don't have to go that far. Well, I know I don't have to go that far, but you just said you would go that far. I personally would, but I don't think you do, Justice Gorsuch. And the reason for that... No, I appreciate your candor about the extent of where your argument leads. And so it seems to me that you could have a state law that doesn't just flip the presumption and require express oral consent, but requires express written consent, maybe a sign, maybe an irrebuttable presumption flipping. I appreciate your candor on that. The other question I want to ask you is black codes. I struggle to see what relevance laws that are outliers. And in Bruin, we're not supposed to consider outliers, that they're put aside under our test. We're looking for the mainstream and a significant tradition. And you rely very heavily on an 1865 black code law in Louisiana. You say it's a dead ringer and a reason alone to affirm the judgment. And I really want to understand how that could be. So let me take those in turn. So first, with respect to the California law, I think it's really important to understand here the Hawaii law has a much broader definition of consent. I know it does. That wasn't the question. Why don't you answer the question posed? About the California law? No, I want to understand how you think black codes should inform this Court's decision making. It's quite an astonishing claim to make. So the black codes are undoubtedly a shameful part of our history, but that doesn't at all mean that this particular law is irrelevant to Second Amendment analysis for two reasons. First, the Solicitor General says correctly, as she did just now, that Louisiana wasn't a state in 1865. The relevant point is what happened in 1868 when Louisiana was admitted to be a state. The Act of June 22, 1868 admitted Louisiana as a state. That was the Radical Reconstruction Congress. It examined the Louisiana laws, including this specific statute, and Louisiana was admitted into the Union by the Reconstruction Congress. There were many laws that the Louisiana— You're not answering the question. The question is it's an outlier, and you just call it a shameful outlier. And I agree with that. And Bruin was supposed to look at the mainstream of our tradition and history, not outlying statutes that were unconstitutional the moment they were passed, and, yes, when Louisiana was admitted to the Union. So Justice Gorsuch, when I said it wasn't— I understand a lot of people like to cite the Black Codes who promote gun restrictions, who would otherwise—they would be garlic in front of a vampire in front of them. But here they like them. They embrace them, and I'm really interested in why. So, Justice Gorsuch, when I said if the Black Codes were a shameful period, there are parts of the Black Codes like this particular statute which were race-neutral, which the Congress of the United States, the same Congress that ratified the 14th Amendment, implicitly blessed by admitting Louisiana back in. It didn't treat that with respect to other laws from other states, but it did here. And most importantly, even the opponents of the Black Codes recognized, as the Sickles General Order says, that you have no right to carry a firearm onto someone's property absent their consent. Now, it wasn't the purpose of the laws in the post-Reconstruction South that disarmed black people. Precisely to prevent them from doing what the Second Amendment is designed to protect, which is to defend yourself against attacks. They wanted to disarm the black population in order to help the Klan terrorize them. And law enforcement officers in that period, in that region, they wanted to put them at the mercy of racist law enforcement officers. So is it not the height of irony to cite a law that was enacted for exactly the purpose of preventing someone from exercising the Second Amendment right, to cite this as an example of what the Second Amendment protects? Justice Alito, we quite agree with you that parts of the Black Codes were motivated by and had exactly that operation. Our point to you is this consent requirement did not operate that way. Indeed, if anything, it protected black churches and black-owned businesses and the like by insisting on this consent rule. And that is why the radical Reconstruction Congress admitted Louisiana back in. They said no to various laws, but they never did that with respect to this, and this law stayed on the books for a long time. More generally, of course, obviously for good reason taken all this time in Louisiana, but remember our argument, if we were to get to the historical analogs and the like, we don't think we even need to. But if you got there, you wouldn't just look to Louisiana in 1865. You'd start with New Jersey in 1771. Well, on Louisiana, in Ramos, on the jury trial right, the question of whether he had a right to a unanimous jury, there were Louisiana and Oregon precedents going way back that allowed non-unanimous juries. And we flatly rejected that historical example for the exact reason that Justice Alito and Justice Gorsuch have been mentioning. Those were rooted in racial prejudice designed to prevent black jurors from having their votes counted on juries in the wake of a decision like Schroeder in 1880. And we just said, no, that's inadmissible to account for that as somehow justifying an exception to the constitutional right. It seems like the same kind of thing here. Justice Kavanaugh, we just disagree with the idea that that applies to this particular law from Louisiana in 1865. But regardless, our tradition goes way back before that. New Jersey in 1771, 1721 Pennsylvania, the law said, quote, you cannot carry any gun or hunt on the improved or enclosed lands of any plantation. The 1763 New York law, which the solicitor general only read part of, says that it was unlawful to carry, shoot, or discharge any musket or other firearm whatsoever into any orchard, garden, or other enclosed land whatsoever. And there's other statute after statute. There's no allegation by anyone that those were motivated by any sort of racist concerns or the like. And what they've said is, oh, no, that was just limited to poaching. That's just wrong. There's two parts, for example, to the New Jersey law. Part two is about poaching. And on those laws, a couple of them that you cite, it seems to me you're approaching the whole analysis upside down from how the court's cases have approached it. The court's cases have started with the text, which declares an individual right. And then in Heller and in Bruin, the court has elaborated on, of course, as there are with all rights, as Heller said, some exceptions. But those exceptions to be recognized must be historically rooted, deep tradition, broad tradition, widely recognized, commonly recognized, not isolated examples, particularly not ones from the Black Coats, but even apart from that, not isolated examples. And I just don't see the kind of broad tradition of the regulation here that you see with the other things specified in Heller, for example. So I agree with some of what you're saying. So I completely agree that the relevant test under Bruin is text, and then the next words you used were as informed by history. And so the question is whether or not there is some sort of right at the framing whether the right to keep and bear arms was understood, the right to assume an owner's consent to bring arms. That's where we think this case, their case, falls apart, because for the first time, you'd be saying, if you accept their invitation in the absence of any affirmative evidence whatsoever, a commentator, a court, anything that said that there was a right to imply consent, there's just nothing. There is precious zero on that. And here's why it's so important. You heard my friend when he stood up. He said, and under questioning from Justice Barrett, hey, is your rule going to apply to private homes? Because lots of states even today have those, Alaska, you know, and Arkansas and the like. And he ultimately said, yeah, because the burden shifting, you wouldn't be able to defend the law under the burden shifting of Step 2 of Bruin, in which you have to have demonstrated historical analogs and the like. That gets everything undone entirely. I mean, this Court has a general rule, Justice Alito wrote about it in Kennedy v. Louisiana, which is when you are coming in to challenge a state law, you bear a heavy presumption that your challenge is invalid, that there's a presumption of good faith and presumption of regularity on the part of the legislature. If you just jump to Bruin Step 2 and say, oh, this law deals with guns, therefore the burden flips to the government, then, yeah, you're going to have a really difficult time defending laws. Every state is like the ones that deal with gun consent on private homes. Well, which is why you don't want to get to Step 2, because it's a lot harder for you at Step 2. But I think what Justice Kavanaugh is asking, and I have the same question, is how can you avoid Step 2? Because the text encompasses it, and that leads you to Step 2, where you have all the difficulties you were just saying. Because if you read Bruin as only about the text, okay, I agree with you. You could say, well, maybe it's the right to keep and bear arms as implicated by these implied default rules, but it is the text as informed by history. And when you ask yourself text as informed by history, where has anyone ever said there's a right to presume consent of the owner in the absence of an explicit statement? It just doesn't exist. But that's the second step when you're looking at the history. I mean, I could see history being relevant at the first step if you're talking about what is the meaning of arms, for example. But when you're talking about things that kind of go to what is the core of the right or is it included, and you're talking about history and tradition, I guess I don't see how it's the first step. Well, I think it's got to be. Otherwise, I think you run into the problem that you've now flipped the burden for every firearms regulation. As long as it deals with guns, then the state has to come in or the federal government has to come in with an affirmative thing. And we have all sorts of laws that – That's exactly what the cases say. I mean, I thought that's what the cases say. If it deals with arms, and this is what Heller Part 3 says, then the government comes in and shows there's a historical tradition. And to get ahead of all this, Heller actually went through and specified a number of kinds of regulations that would be permissible because they are so broadly and deeply rooted. I mean, what's wrong with that reading of our precedent? Because then it would really, as the Everytown Brief says, threaten gun regulation more generally in ways this Court has so far not reached because you have all sorts of times in which, like take the 922 statute, 11 different categories of things that are singled out as gun regulation. If every single time the state had to defend the burden on each of those things and say, you've got to find historical analogs, that really does undo, I think, the much more limited nature of the inquiry that – I thought your answer to Justice Barrett and Justice Kavanaugh is that really step one is trying to help us to understand what the scope of the right is.  The Second Amendment right. Is it really being implicated here?  And so that when you have a situation like this one in which there is broad consensus, everybody agrees that there is some limit to the Second Amendment right, and you read a case that said that limit was geography in the sense that you don't have a Second Amendment right to bring your gun onto someone else's private property. They have to consent for you to be able to do that. We have already limited the scope of the Second Amendment right for purposes of this discussion because we're talking about a right that doesn't just freely exist. So in the Chief Justice's leafletting example, it's similar. Like, I don't see the Second Amendment operating differently than, say, the First Amendment because in the leafletting example, the reason why you get to go up to the person's door is not because you have a First Amendment right to do that. You get to go up to the person's door because there is a custom and tradition of implying the person's consent for you to do that in that situation. That all the states, everybody says, when you come for the purpose of passing a leaflet, we are going to assume, we're going to imply that the owner is allowing you to do that. He doesn't have to put up a sign that says, please come. But it's operating around property rights, not that your First Amendment right is what is getting you onto his property. Similarly, the Second Amendment right is not getting you onto someone's property in this way. If it's a private property, even the property open to the public. It's the implicit consent that many states have allowed that is what is doing the work of allowing you to carry your gun in that gas station. Am I right about that? That's exactly right, and the one thing I would add is that what I think is doing the work in my friend's argument is some sort of insinuation that Hawaii has singled out and is hostile to guns or the Second Amendment and the like. And I point you to two reasons why that's wrong. Number one, Hawaii has these very same laws about implied consent and changing the default rules for other things besides guns. So 445.115 has it for cards and banners and placards, akin to the example that you're mentioning before. 339.4 is about litter and bringing it on. What 291c is about vehicles. And what you're saying, I think, is that there is no Second Amendment right to assume implicit consent. To the extent we're talking about is this about consent, and I think we are because you don't have a right to go on without consent, then is the Second Amendment doing work with respect to allowing you to say I have a constitutional right to assume that I'm allowed to be here? And you're saying they have no case, no history, no nothing that establishes that principle. That's exactly right. And the other thing I'd point to about this motivation attack by my friend on the other side is that the legislature took Bruin seriously. This statute's all about making sure the right of Bruin is vindicated. And just last year, for example, Hawaii issued 2207 concealed permits for firearms. You know, they only denied 119 applications, and the majority of those were denied because people didn't fill out the application in full or they got it out of time. Thank you, counsel. Justice Thomas? If you're going to cite the Louisiana Black Codes of 1865, don't you also have to cite the subsequent adoption of the 14th Amendment that was in part generated because of laws like that? Right. So that is exactly our point, that the Reconstruction Congress that ratified the 14th Amendment, this is the unusual case in which you have those folks saying effectively Louisiana should come in. And many of the parts of the Black Codes, including parts that Justice Alito was referring to, that were racially discriminatory about firearms were struck from the Louisiana law. But this law stayed in effect. And so, yes, we do think it is relevant history. We don't think our argument depends on it because there's statute after statute from the founding on. And the idea that the number of statutes we've provided isn't enough I think is very hard to reconcile when you have zero tradition, zero evidence on the other side saying these statutes were problematic. I mean, these statutes are around. You would have thought someone, if this was an infringement on the right to keep and bear arms, would have had a court case, a commentator, anything like what you had in Bruin. You've got none of that. Well, actually, there was quite, as I said in my McDonnell opinion, quite a bit of discussion of these sorts of laws and the consideration of some that they thought that the privileges or immunities clause in the 14th Amendment preempted these. That's simply my point. So, Justice Thomas, I agree with you about what you said there, but I don't think it applied to this specific question, which is private property default rules. I think the evidence you were talking about there dealt with other aspects of state regulation over firearms. Justice Alito? Justice Sotomayor? Three-part question. In one or two sentences, could you finish answering the California point that Justice Gorsuch raised? Number two, finish your list on where else the state of Hawaii has split the presumption. You got up to littering and then you were cut off. And then number three, I have never quite understood the court's recent jurisprudence on outliers don't count. I don't know how much outliers mean. Meaning at the founding, there were 13 states. I don't know how many territories at the time because I don't remember off the top of my head, but there were at least four states that had flipped the presumption, New Jersey, New York, Maryland, and Pennsylvania. And then later there was Massachusetts in 1790, at least for a group of islands. And then you don't have just the black codes. You have Oregon and Florida flipping the presumption a little later on. So it seems to me that you can't call all of these laws this many outliers. And so the custom and tradition that existed was the license you had and whether you presumed or didn't presume permission could be flipped, correct?  So why don't you answer the other thing. Yeah. So on the California thing, the one thing I would just add to my prior discussion with Justice Gorsuch is just, I think the overall history of what the Hawaii legislature did here was relevant. They weren't trying to attack a second-class right or something like that. They were rather trying to take Bruin seriously by opening up what counts as consent, unlike California, deviating even from the old historical laws like New Jersey in 1771, which required written consent. And I think what did the work in my friend's argument in his opening statement was this idea that 96.4 percent of Hawaii is now encompassed. You pointed out that dealt with sensitive places. But there is a much more fundamental problem, and it has infected this case from the start. If you read page one of his brief, it says, quote, it says 96.4 percent of the publicly accessible land in Hawaii is impacted by this law. The map he's got isn't even about Hawaii. It's about one county in Hawaii, not even the most populous county in Hawaii, and it's a map he drew himself. So I just caution the court into saying, because if you read these briefs, it does sound like, oh, the government of Hawaii is out to get guns or something like that. Nothing could be farther from the truth. They've taken Bruin seriously, as the permit statistics I read to you say. With respect to Hawaii singling out firearms, there's statute after statute. I was reading 291.112, which is that you can't use a vehicle for habitation on private property, quote, without the authorization of the owner. There's also 633.16 that you can't remove shopping carts without the written consent of the owner. There's statute after statute like this, and the amicus briefs from the property law professors goes through and says, this is true not just in Hawaii, but in state after state, they flip default rules all the time. Your last question was about outliers, and I think here our most important point is we don't think that there's some sort of mechanistic formula for how many states is enough or anything like that. We do think it's relevant that there are a number of states at the founding that do have this. This court on the sensitive places part of Bruin said legislative assemblies may be a sensitive place. There was only one state in the founding that had that. That was Maryland, and it would have passed two separate laws five years apart during the colonial era. That was enough to count as an analog. We certainly think the much larger number here is enough to count as an analog, because these laws actually did the same thing as what the Hawaii law does. It said, for respect to property that is open to the public, like plantations, like premises, like enclosed land, Professor Hartog says that includes seed stores, other retail establishments akin to the kinds of things that my friend is challenging here. There is historical precedent for all of that. We think that's certainly enough to make this constitutional. Justice Kagan? So just on your last point, Mr. Katyal, I took Ms. Harris to be saying with respect to your analogs at Bruin Step 2 that her principal point was, look, it's not about like is it about poaching, but the difference between those laws and this law is that those laws were about lands that were closed to the public, and that was her principal point that made that like just a different category. Right, and it just blows off the word improved in the statutes. It's not just about fence land, but improved land. For improved land, the statutes did change the default rule and say you couldn't imply the consent of the owner, and as Professor Hartog said, that applied to stores. It applied to plantations. Indeed, that's the definition of plantations, and it applied to premises, which is another word used in some of these statutes, and so the idea that it didn't apply to these types of things that are just like what my friends are challenging is just wrong. Okay, and on your Step 1 inquiry, which I find interesting and difficult, I mean, I think somebody could say, look, what these consent-flipping, default-flipping rules do, they do burden the carrying of firearms, and that's what they are, and to incorporate the burden into one's understanding of the scope of the right is a kind of category mistake, that the burden is supposed to be at Step 2, and these are burdens on the carrying of firearms. So two things. One, factually, we just fundamentally disagree that this burdens firearms. As Justice Alito was saying earlier, if people in Hawaii don't want to have the guns anyway, they're always going to be able to, even under their rule, have signs that say no guns allowed. So either way, you could have that burden. The second thing is legally. This Court has made clear as day at page 22 of Bruin, you can't ask that burden test. Here's the language. You said, quote, Howard and McDonald expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way. And so, you know, that, which my friend is definitely trying to say, that this burdens the right, that is not a Second Amendment violation. That's going down the road of undue burdens that this Court has criticized in a separate number of contexts and saying that's a smokescreen for policy judges' preferences. Rather, the inquiry at Bruin Step 1 has always been text is informed by history. And when you ask yourself what in the text informed by history this Hawaii law violates, the answer is precious zero. No commentator, no treatise, no court. No one's ever said you have a right to imply consent of the private property owner. And rather, the fundamental tradition, which Justice Meyer was saying earlier, that Justice Scalia recognized in the Jardine's opinion, is that there's a fundamental right to exclude. And that right to exclude has always meant at the time of taverns and the like, you can exclude people for violating the terms on which they come in, even if your tavern's open to the public. Thank you. Ms. Gorsuch? Your Honor, as I can tell, the movement to flip the burden with respect to firearms began in the states in 2020. Is that right? The burden to flip the firearms with laws like this, I think, arose after Bruin. I think that was when this Court's decision in Bruin happened. And then laws like the states like Hawaii, in which there was no tradition at all of carrying, had to deal with this question for the first time. Thank you. Justice Kavanaugh? How many states have laws like Hawaii's with respect to firearms on property? So I think five states have enacted those laws just in the few short years since the Bruin decision. I think other states, there's a brief for you from D.C. saying some other states are considering it. Our point is the Constitution permits both types of rules. It's not constitutionally compelled that you have to use the Hawaii rule. States function as laboratories. They can pick either default rule. Neither is an infringement on the Second Amendment right to keep and bear arms. Thank you. Justice Barrett? Justice Jackson? And it's not an indictment necessarily that this arose after Bruin. It was in response to Bruin because Bruin gave rise to the need for clarity about property owners. Once Bruin said you can carry the gun outside of your home and there was an alternative, well-established principle that private property owners can exclude people, I think the states were trying to make sure that property owners had the opportunity to do that. And that only became necessary once Bruin allowed people to carry their guns anywhere. That's exactly right. It wasn't like they were necessarily trying to keep people from carrying the guns. They were giving property owners the right to exclude by making sure that they were asked, do you want this gun in your store? Exactly. And I was saying to Justice Gorsuch with respect to California law, Hawaii took it far more seriously. They said we want to make sure that you have the opportunity to get on-the-spot oral consent, which is why the gas station hypothetical that the Chief Justice used and the others, it is not an issue under the Hawaii law because you do have the ability to go and ask for consent, even if there's no sign one way or the other. Thank you, Counsel. Rebuttal, Mr. Beck. Your Honor, as NRA's amicus brief makes very clear, there is a historical tradition of carrying on private property open to the public. This whole legal theory regarding the presumptive ban, default rules, start off the law review article that was published in 2020. And the premise of that law review article is putting in a presumptive ban like Hawaii has would lessen people from carrying. The State of New York adopted that law first, and the Governor of New York said the express reason they were doing that was to undermine the Bruin opinion. There's a clear body of evidence here that this was done to undermine Bruin and to undermine the Second Amendment right. And thus, this law very clearly implicates the Second Amendment, and the State has simply failed in its burden to justify this law through relatively similar historical analogs. Therefore, this Court should rule in our favor. Thank you, Counsel. The case is submitted.